[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM
John Tuttle died during the pendency of this action and Jeremy Tuttle as successor executor of his estate has been substituted as party plaintiff. Also during the pendency of this action Charlotte R. Tuttle has been joined as a party defendant but because of bankruptcy proceedings, there is a stay as to her.
John and Charlotte Tuttle were husband and wife. He was an upper level executive of what is now Exxon and he had accumulated a substantial block of its stock. He also had other securities in his portfolio. He retired in the 70's and the couple moved to Heritage Village in Southbury. This is a facility consisting of numerous condominiums owned and occupied by senior citizens, most if not all being retirees. Fahnestock Co. is a brokerage house with headquarters in New York City and a branch office at Heritage Village within easy walking distance of the Tuttle's condominium. Both of the Tuttle's opened separate accounts with Fahnestock and the account executive assigned to them was Edward H. Mitcham, Jr. In the beginning both were conservative in their investment philosophy and this continued to be the case with Mr. Tuttle. With the passage of time, Mrs. Tuttle became more and more aggressive in her trading and she began to deal in stock options and puts, both highly speculative forms of investment. To finance her activities she entered into a margin agreement with Fahnestock. She was very sophisticated in her knowledge of the market and of trades. She subscribed to a number of services that commented on the market. She spent much of her time at the Fahnestock office and regularly used its computer terminal to follow issues in which she was interested and she conferred with Mitcham on an almost daily basis. In the beginning Mr. Tuttle not only accompanied her but also sat in on her conferences with Mitcham. However he rarely, if ever, contributed to their CT Page 257 conversations and left all investment decisions up to her. After a time he simply sat in the waiting room and read while his wife was operating the computer terminal and conferring with Mitcham. Then even that ceased and for a number of years he never went to the Fahnestock office.
Mrs. Tuttle was fantastically successful in her trading. In a matter of a few years her original position of less than $100,000 had grown to the point where her equity in her account with Fahnestock approximated two million dollars. Because of her great activity in the market and because she was dealing on margin, her account was constantly monitored by the margin department at the New York main office. In mid October, 1987, the performance of the market was such as to trigger a margin call upon her. Both a representative from the margin department and Mitcham informed her of alternatives in meeting the margin call. One was to liquidate at least part of her holdings and buy back a sufficient quantity of her outstanding puts and options to bring her account into compliance; another was to deposit additional securities with Fahnestock as collateral for her margin account. The latter option had very real risks to it for if the market dropped significantly, she would be hit with a double whammy in that her exposure on the outstanding puts and options would increase while the value of the collateral would decrease. Her initial decision was to deposit additional collateral and on October 15, 1987 she delivered to Mitchum a certificate of Exxon stock registered in the name of her husband and on October 16 another certificate so registered, the total number of shares being 10, 232. She was told that in order to transfer those shares to her margin account it would be necessary to obtain stock powers signed by Mr. Tuttle and she did obtain such executed powers and delivered them to Mitcham on the 16th. On the 16th the market dropped approximately one hundred points but computation by the margin department on Saturday, the 17th, factoring in the Exxon stock, indicated that despite the big drop, there was equity in her account. The margin department recommended to her, on the 17th, that in addition she should buy back a substantial quantity of the outstanding puts and options. On Monday, the 19th Mitchum repeated that advice so she did put in substantial buy orders. However, the market dropped about 500 points on the 19th and trading on the exchange was so hectic that many of those buy orders could not be executed.
A receipt issued by Fahnestock on October 20, 1987 indicates there was delivered to it 180 units of Nuveen Connecticut Trust 177 Quarterly and 100 units of Nuveen Multi-State Series 131 Connecticut Monthly, both registered in the name of the husband. No stock powers concerning these certificates have been produced but there is in evidence a document entitled "Use of Certificate Registered In Name Other Than That Of The Account." The body of CT Page 258 that document recites that the certificates were "duly assigned in blank, and requests that you place said securities in the account of Mrs. Charlotte R. Tuttle-A05-9150001-201 whom you may, for all purposes whatsoever, treat as the sole owner of said securities and any proceeds thereof". Mrs. Tuttle denies all knowledge of this document but admits that the signature, "John B. Tuttle", is that of her husband. Comparison of that signature with his signature on other documents in evidence leaves no doubts in my mind but that the signature is indeed genuine.
The tremendous drop in the market on October 16 and 19, totaling about 600 points, resulted not only in erasing Mrs. Tuttle's entire equity in the account but also left her indebted to Fahnestock for about one million dollars.
Jeremy Tuttle is a son of the couple. He specializes in neuro-physiology and holds a PHD in Neurology from Johns Hopkins. He testified that as of October 15, 1987, and for sometime prior thereto, his father had mental problems that rendered him incompetent to handle his financial affairs. This was confirmed by Dr. Rosen, the family G.P., and by Ms. Paddock, an L.P.N. who aided in taking care of Mr. Tuttle from some time in 1985 on. In mid November, 1987 Jeremy Tuttle applied to the Court of Probate for the District of Southbury for the appointment of a conservator over his father. The court appointed Atty. Walsh to represent Mr. Tuttle and after meeting with him, Walsh reported that he was indeed incompetent to handle his affairs. On December 30, 1987 Jeremy was appointed Conservator for his father. Rosen, Ms. Paddock and Jeremy all testified that Mr. Tuttle had a significant history of physical problems. Mrs. Tuttle testified that although they lived together, she had had problems in knowing when Mr. Tuttle understood things and when he didn't.
The complaint is in six counts. Certain themes are repeated in all six counts. All allege that as of the time of the transfers Mr. Tuttle was in fact incompetent although not so judicially declared. I have no problem in concluding that the plaintiff has borne the burden of proof on this point. The first count does not allege knowledge by Fahnestock of the fact of incompetency but the remaining counts do make that allegation. They also allege that even if Fahnestock did not know of the condition, that it should have known of it. I find that the plaintiff has failed to carry its burden as to knowledge actual or imputed. Mrs. Tuttle did testify that she had told Mitcham that her husband had mental problems including loss of memory and disorientation. She also testified that she had informed other members of the staff and a fellow trader, one Thure W. Dahl, of this. This claim was vigorously denied not only by Mitcham but by Mrs. Hamblin, his assistant and by Mr. Dahl. All were aware that Mr. Tuttle had physical problems; that the couple had significant CT Page 259 medical expenses for several years before October 1, 1987; that a caretaker was frequently in attendance; that Mr. Tuttle had not been to the Fahnestock office for several years; and that when last seen he walked slowly, but these were readily attributable to those physical problems and they would not trigger off concern as to his mental condition. In a retirement community such as Heritage Village, these were things to be expected. Mitcham had a number of accounts where the clients suffered from physical problems without mental impairment. There were occasions when Mitcham wanted to contact Mrs. Tuttle and he would call the home and Mr. Tuttle would answer the phone. He had no difficulty in recognizing Mitchum's voice and in telling him Mrs. Tuttle's whereabouts.
Jeremy Tuttle also testified that in a conversation with Mitcham in 1987 he had remarked on his father's mental state. Not only was this vigorously denied by Mitcham but also in earlier proceedings after this lawsuit was instituted and Jeremy Tuttle was fully aware that his father's mental condition and Fahnestock's knowledge of it would be a vital issue he described that conversation in detail and it concerned only his misgivings about his mother's highly speculative trading with no mention at all of his father's condition.
If anyone at Fahnestock had any reason to be concerned about Mr. Tuttle's competency it would be incredible that it would accept transfers of securities from him as additional collateral rather than exercise its clear power under the margin agreement to liquidate sufficient of her assets to buy in, on October 15, enough of her outstanding puts and options to meet the margin call.
Another factor is that Fahnestock well knew that Mr. Tuttle had no particular interest in the market and left all investment decisions up to his wife. Finally, the October, 1987 transfers from him to her were not isolated or novel incidents as he had made previous transfers to her and at least twice had transferred Exxon stock to her to assist her in meeting margin calls, and these were at times when there was no question as to his competency.
Cumulatively all of the above convince me that no one at Fahnestock had knowledge of his mental condition or of facts that would cause a reasonable person to feel that inquiry as to that condition was indicated.
Count two alleges that by reason of Fahnestock's knowledge, actual or imputed to it, of the incompetency its using stock powers executed by him constituted fraud. The short answer is that the plaintiff simply has not proved such knowledge. CT Page 260
Count three alleges that Fahnestock was in a fiduciary relationship to Mr. Tuttle. Nothing was offered to indicate that Fahnestock gave advise to Mr. Tuttle. It simply acted as an agent to execute transfers.
Count four alleges that Fahnestock's actions constituted intentional and wanton violation of Mr. Tuttle's property rights. Again this depends on proof of actual or constructive notice of his condition and that is lacking.
Count five alleges that Fahnestock committed theft. This also requires proof of actual or imputed knowledge, which is lacking.
Count six alleges violation of CUTPA. Without even addressing the question of whether or not that act applies to security transactions, the proof of actual or imputed knowledge is lacking.
A common theme of all counts is that Mitchum induced Mrs. Tuttle to use her husband's assets and acted in concert with her to put those assets in her account. The proof is clear that it did no such thing. It offered her alternatives of either retrenchment, which it recommended, or supplying additional collateral, and she alone, convinced that the market would rebound quickly and substantially, chose the latter. Based on her decision they made available to her the necessary documents to carry it out.
That leaves the allegation of the first count that Mr. Tuttle received no consideration for the various transfers.
The first basic principal is that a transfer made by an incompetent to a transferee who has knowledge of the incompetency is void. However, as is the case here, if the transferee had no knowledge, using whatever adjective you please, actual, constructive or imputed, then at most the transfer is voidable, and general equitable principles must be applied to determine whether or not a court should grant relief. Coburn v. Raymond,76 Conn. 484. If Mrs. Tuttle had not brought in additional collateral, Fahnestock would have exercised its clear power under the margin agreement to liquidate her holdings and buy in her outstanding obligations. Because of the transfers of the Exxon stock, it forbore to do this. Forbearance extended to a third party is consideration. Markel v. DiFrancesco, 93 Conn. 355. Therefore Mr. Tuttle did receive consideration for the transfer of the Exxon stock and clearly it would be impossible for his estate, which has a probate inventory of just over $3,500, to restore Fahnstock to its position prior to the delivery of that stock. CT Page 261 Fahnestock did at all times act in good faith and without knowledge of adverse claims.
With respect to the Nuveen securities, however, it is difficult to find any consideration. The delivery was made on October 20, when Mrs. Tuttle had not only been wiped out but was in a debtor position, so there was nothing from which Fahnestock could forbear. The only advantage Mr. Tuttle could gain from those transfers was whatever satisfaction he might feel from aiding in the reduction of his wife's indebtedness and that is hardly consideration.
In addition, no stock powers were executed or delivered with respect to the Nuveen securities, and Fahnestock admits that the "Use of Certificate" form which was executed and delivered does not render those securities negotiable. What the delivery amounted to was strictly a change of physical possession for safekeeping.
It is noteworthy that dividends from one of those certificates has continued to be paid to John Tuttle or his estate, and dividends from the other certificate have been made into a Nuveen Municipal Bond Fund registered in the name of John B. Tuttle. Therefore his estate can be fully compensated by Fahnestock delivering those certificates to the plaintiff.
In view of the above, I see no purpose in pursuing the defendant's special defenses other than the claim of lack of standing because Jeremy Tuttle as executor purported to assign the estate's interest in these proceedings to an entity entitled "Tuttle Family Trust". I know of no power in an executor to make such an assignment and I deem it a nullity.
Judgment may enter for the defendant with respect to the Exxon stock. With respect to the Nuveen securities, judgment may enter requiring Fahnestock to deliver physical possession of them to the plaintiff.
J. HEALEY, STATE TRIAL REFEREE